**Opinion issued August 1, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-12-00505-CV**

————————————

**NEW HAMPSHIRE INSURANCE COMPANY, Appellant**

**V.**

**PEGGY C. ALLISON, Appellee**

On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 1050904

## O P I N I O N

A jury determined that the fatal heart attack suffered by William Allison was a compensable injury under the Texas Workers' Compensation Act. New Hampshire Insurance Company appeals the judgment based on that determination. In three issues, New Hampshire Insurance argues (1) the trial court abused its

discretion by admitting the testimony of Peggy C. Allison's causation expert, (2) the evidence was legally insufficient to support the jury's verdict, and (3) the evidence was factually insufficient to support the jury's verdict.

We affirm.

## Background

William, more commonly known as Bill, had worked at Sterling Chemical as an operator. On October 23 and 24 of 2008, Bill attended a fire training school as a requirement for his employment. In the evening of October 25, 2008, Bill suffered a heart attack, which ultimately caused his death later that evening. The sole question presented to the jury was whether that heart attack was a compensable injury under the Texas Workers' Compensation Act.

There was some dispute in the testimony about the amount of physical exertion Bill faced in his regular job as an operator. It was agreed that Bill had to wear fire-retardant clothing, but that consisted of a one-piece coverall that he wore over his own clothing. The coverall is not any heavier than normal clothing. He also frequently had to wear goggles, a hard hat, ear protection, and a respirator as well as rubber boots when it rained. Bill had to periodically use 20 to 50 pounds of force to push or pull a valve or other devices. The job regularly involved climbing stairs. It also included lifting heavy bags of different chemicals.

Sharon Denise Hill, an operator in the same department as Bill at Sterling Chemical, testified that operators would lift 22-pound bags about eight times per shift. She also testified that they would lift 30-pounds bags, though the frequency was not given. On some occasions, they would lift 50-pound bags.

Terry Bellard, another operator at Sterling Chemical, more or less agreed with the weight of the bags that Bill had to lift. In addition, he testified that, for heavier bags, they would use a forklift. He explained that, as an operator like Bill, he spent 75 to 80 percent of his time in the control room.

Terry also testified that he had gone to the fire training school for a number of years, including the year that Bill went. When presented with the gear that Bill had worn during the training, Terry explained that the gear was significantly heavier than anything they had to wear as operators at Sterling Chemical. He also explained that, while working on the fire drills, the trainees were exposed to very high heat in the heavy gear, causing them to sweat. He testified that people at the training for the first time would get scared due to the intensity of the fires.

Bill had bad knees. As a result, he was driven to each of the props—as the fire training sites were called—on a cart. Nevertheless, Bill was present at each of the drills. Terry testified that Bill wore his gear at each of the drills and participated in the drills. Bill worked as one of the men on the fire hose on at least

3

one drill. The hose was heavy, was under pressure, and required at least four men to hold and control.

Some conflicting evidence was presented by Jason Loyd, the trainer that worked with Sterling Chemical during Bill's training. The fire training school is a part of the Texas A&M University system and is located in College Station. It is the largest "fire field" in the world. Each year, they "train more than 81,000 firefighters and emergency response personnel from all 50 states and more than 50 foreign countries." Jason trained hundreds, if not over a thousand, people each year. He testified at his deposition and at trial that he could remember Bill from the training over two years earlier "because he had a neat attitude."

Jason testified that, instead of participating in the drills, Bill stayed next to him during the training. As a result, Bill never operated the fire hose. Jason also testified that on some of the props, Bill did not wear the heavy gear, though Jason could not remember which ones. Jason explained during his testimony that, any time something was different from usual in a class he was teaching, he would note it on his form. His form included a note that Bill rode from prop to prop in a cart, but did not mention that Bill did not otherwise participate in the training or that Bill did not wear full gear at some of the props.

Bill's group participated in five drills overall. Four were on Thursday, and the fifth was on Friday morning. It was undisputed that Bill worked as a

4

dispatcher on the last drill, directing other people where to go with a radio. This allowed him to be further away from the fire. It was also undisputed that Bill did not exhibit any signs of distress during the training.

Bill got home in the early afternoon on Friday. He picked up his granddaughter from school and was home when Peggy, his wife, got home from work. Peggy testified that she was shocked at Bill's appearance because he looked so lifeless. Instead of being his usual energetic self, he sat on the couch the entire time.

Later that evening, Bill went with his daughter, Sherri, and granddaughter to see his grandson play football. His daughter testified that, when she saw Bill that evening, he looked pale. She sat next to him during the game. Sherri explained that Bill is usually very talkative, but he did not talk much during that evening.

When Bill got home, he went straight to bed, which was also unusual. In the morning, he told Peggy that he did not have an appetite. His son, Charles, who was living with Bill and Peggy at the time, saw him in the morning, slouched down on a bar stool. Charles saw Bill again before Charles left for work in the early afternoon. It appeared to Charles like something was wrong with Bill because Bill was not his usual joyful and talkative self.

Peggy had gone to visit her mother in the morning and returned a little after 5:00 that evening. Bill was slouched on the couch watching television. They

decided to go visit their son at his work, pick up some food for dinner, and return home. When they sat down to eat back at home, Bill took one bite of his food, stood up, and went to the bedroom. When Peggy went to check on him a short while later, she found him leaning against some furniture and extremely pale. After consulting with her sister, a registered nurse, Peggy took Bill to the hospital.

During the drive, Bill complained of pain and was sweating profusely. He also fell over on Peggy. She had to push him back up to resume the drive. By the time they were at the hospital, Bill could no longer speak and could not get out the car. He was taken inside, where it was determined that he was having a heart attack. He died some time later that evening in the hospital.

Sharon, one of the operators that testified, also testified that she had called Peggy the night of Bill's death. Sharon and Peggy had never met before, but Peggy knew about her through Bill and had talked to her briefly on some occasions when Sharon would call the home to talk to Bill. Sharon stated that Peggy had told her that Bill was behaving normally the day of the heart attack and had cut the grass, gotten a haircut, and bought a birthday card that day. Peggy did not recall talking to Sharon on the telephone, but denied that Bill had mowed the grass or gotten his hair cut that day.

At the time in question, Bill was 66 years old. He had a number of medical conditions at the time he was required to go to the fire training school. He had

6

type-two diabetes, which placed him at an increased risk for coronary artery disease. Bill was also hypertensive, which also placed him at increased risk for coronary artery disease. The record additionally established that Bill did, in fact, have coronary artery disease. The central dispute at trial was whether Bill's heart attack was a result of the natural progression of his coronary artery disease or whether it was caused by a specific event occurring in the course and scope of his employment.

There were certain stages that both sides' experts agreed that Bill went through that led up to his fatal heart attack. Both experts agreed that Bill had a buildup of plaque in his arteries. They also agreed that Bill experienced a "rupture" at the site of one of the plaque buildups. This then caused a clot to form at the site of the rupture, which led to the artery becoming completely blocked. Bill suffered a heart attack as a result. The experts did not agree on the likely timing of each of these stages.

Both sides' experts also agreed that physical stress beyond a person's usual physical activity can increase the risk for a heart attack. They did not agree, however, on the window of time after the increased physical stress that a heart attack could occur in order to be correlated to the increased physical stress.

Doctor Randal White, a cardiologist testifying on behalf of New Hampshire Insurance, opined that Bill's heart attack was a result of the natural progression of

his coronary artery disease. He explained that he was assuming that the physical stress Bill underwent during the fire training school was no different than his usual work-related activities. As a result, it was not enough to cause a plaque rupture. He also testified that the increased risk for a heart attack lasted for 45 minutes following increased physical activity and then returned back to that person's baseline. After that, he testified, there was no correlation between the increased activity and the heart attack. Instead, Dr. White explained, Bill's diabetes put him at the same risk for a heart attack as a person who has already suffered their first heart attack.

Doctor Gary Sander, a cardiologist testifying on behalf of Peggy Allison, opined that Bill's activity during fire training school caused the rupture that led to his fatal heart attack. He recognized that Bill had coronary artery disease, diabetes, and hypertension. He testified that, from a cardiac perspective, Bill had been stable up until the training. He had even had "major abdominal surgery" for colon cancer less than a year before his heart attack and had been "asymptomatic" up until the day after his training. Unlike Dr. White, Dr. Sander viewed Bill's physical activity during fire training as significantly higher than his usual physical activity during work. He testified there was a continuity of symptoms from the time that Bill left the fire training school until he had his heart attack and that he

did not see any significance in the period of time from when he left the training to when he had his heart attack.

Dr. Sander is a cardiologist with a Ph.D. in biochemistry and is licensed in the State of Louisiana. He received his medical degree in 1974. He has done research in cardiology both on animals and in clinical research. He teaches medical students and fellows at Tulane and Louisiana State University. For a period of time, he ran the Cardiology Fellowship Training Program at Louisiana State University. Currently, he teaches as well as maintains an active private practice.

### Statutory Interpretation

Many of New Hampshire Insurance's arguments are based upon a certain interpretation of section 408.08 of the Texas Labor Code. Because our interpretation of section 408.008 influences our determination of a number of matters, we analyze it separately.

### A.   Standard of Review

We apply a de novo standard of review to matters of statutory interpretation. *Buck v. Blum*, 130 S.W.3d 285, 290 (Tex. App.—Houston [14th Dist.] 2004, no pet.). A trial court has no discretion in determining what the law is, which law governs, or how to apply the law. *Poland v. Ott*, 278 S.W.3d 39, 45 (Tex. App.— Houston [1st Dist.] 2008, pet. denied).

9

## B. Analysis

Section 408.008 of the Texas Labor Code establishes the requirements for a heart attack to be a compensable injury. TEX. LAB. CODE ANN. § 408.008 (Vernon 2006). Specifically, the statute provides,

A heart attack is a compensable injury under this subtitle only if:

(1) the attack can be identified as:

    (A) occurring at a definite time and place; and

    (B) caused by a specific event occurring in the course and scope of the employee's employment;

(2) the preponderance of the medical evidence regarding the attack indicates that the employee's work rather than the natural progression of a preexisting heart condition or disease was a substantial contributing factor of the attack; and

(3) the attack was not triggered solely by emotional or mental stress factors, unless it was precipitated by a sudden stimulus.

*Id.* New Hampshire Insurance argues in its brief and argued at oral argument that, to be compensable, the heart attack must occur during work hours.

When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. TEX. GOV'T CODE ANN. § 312.005 (Vernon 2013); *see Harris Cnty. Appraisal Dist. v. Tex. Gas Transmission Corp.*, 105 S.W.3d 88, 97 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "Unambiguous statutory language is interpreted according to its plain language unless such an interpretation would lead to absurd results." *Hernandez v. Ebrom*, 289 S.W.3d

316, 318 (Tex. 2009) (citing *Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999)). Finally, we presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

For a heart attack to be compensable, it must be identified as having "occur[ed] at a definite time and place." LAB. § 408.008(1)(A). It must also be identified as having been "caused by a specific event occurring in the course and scope of the employee's employment." *Id.* § 408.008(1)(B). There is nothing in the plain language of the statute to support New Hampshire Insurance's argument that the statute requires the heart attack to have occurred during work hours.

During oral argument, New Hampshire Insurance argued that, without such an interpretation, "a heart attack occurring at a definite time and place" would be synonymous with "a heart attack," since all heart attacks occur at a definite time and place. Accordingly, New Hampshire Insurance argues, such an interpretation would render the phrase "occurring at a definite time and place" meaningless.

The statute does not simply require that the heart attack must occur at a specific time and place. Instead, the statute requires a heart attack to be *identified* as having occurred at a specific time and place. *Id.* § 408.008(1)(A). From this, it can be reasonably concluded that this subsection excludes from compensability

11

heart attacks that are known to have occurred some time in the past but the specific time and place of the attack cannot be identified. There is no need, then, to take language only present in subsection (1)(B) and insert it into subsection (1)(A) in order to give subsection (1)(A) meaning.

New Hampshire Insurance also relies on *Transcontinental Insurance Co. v. Smith*, 135 S.W.3d 831 (Tex. App.—San Antonio 2004, no pet.) *superseded by statute on other grounds as recognized in Discover Property & Casualty Insurance Co. v. Tate*, 298 S.W.3d 249, 257 & n.5 (Tex. App.—San Antonio 2009, pet. denied) to support its contention that the heart attack must occur during work hours. In *Smith*, the employee began having arm and chest pains at work and was admitted to the hospital a short time later. *Id.* at 833. The court never held, however, that these facts were necessary to establish compensability. Instead, the issue in *Smith* was whether evidence of symptoms developing gradually rather than suddenly negated the requirements of subsection (1). *Id.* at 834. The court held the evidence did not negate the requirements. *Id.* at 835. Specifically, it held that the evidence was "sufficient to pinpoint the heart attack as [1] occurring during the afternoon of April 17, 1998, and [2] caused by the specific event of driving grade stakes." *Id.* Contrary to New Hampshire Insurance's argument, the court's holding kept the two elements of subsection (1) distinct. *Id.*

12

We hold that the statute does not require the employee's heart attack to occur during work hours to be compensable.

## Expert Testimony

In its first issue, New Hampshire Insurance argues the trial court abused its discretion by admitting the testimony of Dr. Sander.

### A.    Standard of Review

We review the trial court's ruling on the reliability of expert testimony for an abuse of discretion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). Under this standard, the trial court has broad discretion in deciding whether to admit or exclude expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998); *Wilson v. Shanti*, 333 S.W.3d 909, 912 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). We reverse only if the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Wilson*, 333 S.W.3d at 912.

### B.    Analysis

For an expert's testimony to be admissible, the expert must be qualified and the opinion must be relevant and based on a reliable foundation. TEX. R. EVID. 702; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). New

Hampshire Insurance argues that Dr. Sander was not qualified to testify as an expert and that his opinion was unreliable.

### 1. Qualification as an Expert

New Hampshire Insurance argues that Dr. Sander was not qualified to testify as an expert because he was not licensed in Texas. For authority, New Hampshire Insurance relies on chapter 180 of the Texas Administrative Code, concerning the monitoring and enforcement of matters relating to the Workers' Compensation Act. *See* 28 TEX. ADMIN. CODE § 180.1–.78 (2013) (Tex. Dep't of Ins., Monitoring & Enforecement). Specifically, New Hampshire Insurance argues that the Administrative Code requires "physicians who render opinions on the status of a claimant," medical examination doctors, and peer review doctors to be licensed in Texas. *See id.* § 180.22(f)(5), (g).

New Hampshire Insurance recognizes that "these rules do not expressly apply to physicians selected by a system participant to serve as a testifying expert." Nevertheless, it argues, the rules "do provide a minimum standard of qualification to guide the trial judge." New Hampshire Insurance does not provide any authority for this assertion, however.

To the contrary, section 410.306 of the Texas Labor Code provides that evidence in a trial for a dispute over compensability of an injury "shall be adduced as in other civil trials." TEX. LAB. CODE ANN. § 410.306 (Vernon Supp. 2012); *see*

14

*also* TEX. LAB. CODE ANN. § 410.301 (Vernon 2006) (providing for judicial review of administrative determinations of compensability). Accordingly, there is no basis to rely on the cited sections of the Administrative Code as a basis for the admissibility of an expert at trial.

Instead, "a witness qualified as an expert by *knowledge, skill, experience, training, or education* may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702 (emphasis added). "[W]hen there is proof of a physician's expertise in the particular areas involved in the case, the trial court abuses its discretion by refusing to qualify the physician as an expert witness." *Keo v. Vu*, 76 S.W.3d 725, 730 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "The term 'physician,' as it is ordinarily used, refers to a person who is licensed to practice medicine. It does not impose any geographical limits." *TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 321 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (internal citations omitted). Neither rule 702 nor chapter 180 of the Texas Administrative Code places any restrictions on what state a doctor must be licensed in to be qualified to testify as an expert.

New Hampshire Insurance also complains of a litany of documents it claims Dr. Sander did not review or alleged facts it claims Dr. Sander did not consider in formulating his opinion. Even accepting these arguments as true, New Hampshire

15

Insurance does not explain how this would establish that Dr. Sander was not qualified to testify as an expert.

In deciding if an expert is qualified, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex.1998) (quoting *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). "The offering party must demonstrate that the witness possesses special knowledge as to the very matter on which the witness proposes to give an opinion." *Keo*, 76 S.W.3d at 731 (citing *Gammill*, 972 S.W.2d at 718; *Broders*, 924 S.W.2d at 152–53).

Dr. Sander is a cardiologist with a Ph.D. in biochemistry and is licensed in the State of Louisiana. He received his medical degree in 1974. He has done research in cardiology both on animals and in clinical research. He teaches medical students and fellows at Tulane and Louisiana State University. For a period of time, he ran the Cardiology Fellowship Training Program at Louisiana State University. Currently, he teaches as well as maintains an active private practice. The trial court did not abuse its discretion in concluding that Dr. Sander was qualified to be an expert witness.

### 2. Reliability of Dr. Sander's opinion

New Hampshire Insurance presents a number of arguments for why Dr. Sander's opinion should be considered unreliable. First, it argues that Dr. Sander's theory for Bill's death does not satisfy the *Robinson* factors. Second, it argues that he could not prove the time of Bill's plaque rupture. Finally, it argues that there was too great of an analytical gap between the opinion and the applicable facts because Bill only minimally participated in fire training and because there was no proof that Bill suffered a heart attack during the training.

In determining whether expert testimony is reliable, we consider the *Robinson* factors. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 215 (Tex. 2010). The *Robinson* factors are (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557. These factors are not exclusive and not all of them apply in each review. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235 (Tex. 2010). We also consider the expert's experience,

17

knowledge, and training.  *Crump*, 330 S.W.3d at 215–16 (citing *Gammill*, 972 S.W.2d at 726–27).

New Hampshire Insurance argues that Dr. Sander's opinion is unreliable because his theory for Bill's death does not satisfy the *Robinson* factors.  Dr. Sander's theory for Bill's cause of death was that Bill experienced a "rupture" at the site of one of the plaque buildups, which caused a clot to form.[1]  This, in turn, led to the artery becoming completely blocked.  Bill suffered a heart attack as a result, and died.

This was Dr. White's theory as well.  Both sides' experts agreed that this is a well-accepted explanation for the progression of a heart attack.  Both sides' experts also agreed that physical stress beyond a person's usual physical activity can increase the risk for a heart attack.  The only portion of their theories for Bill's

---

[1]    The parties dispute whether Dr. Sander's opinion was based on a "differential diagnosis."  Both parties appear to agree that Dr. Sander performed a differential diagnosis, but New Hampshire Insurance argues that he could not use it because he was not a treating physician.  *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 216 (Tex. 2010) (defining "differential diagnosis" as a diagnostic method where "*a treating physician* formulates a hypothesis as to likely causes of a patient's presented symptoms and eliminates unlikely causes by a deductive process of elimination" (emphasis added)); *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (defining "differential diagnosis" as a clinical process used to form a final diagnosis for proper treatment).  If a differential diagnosis, by definition, is limited to treating physicians, then Dr. Sander did not perform a differential diagnosis.  If it is not limited to treating physicians, then Dr. Sander's analysis may have been a differential diagnosis.  Even if he formed his opinion by use of a differential diagnosis, this does not "exempt the foundation of a treating physician's expert opinion from scrutiny."  *Crump*, 330 S.W.3d at 217.  Accordingly, resolving this dispute would not have any effect upon our analysis.

18

cause of death that the experts did not agree on was the window of time after the increased physical stress that a heart attack could occur in order to be correlated to the increased physical stress.

Given that both well-qualified experts agreed on the overall theory of how Bill died and that higher-than-normal activity can increase the risk for a heart attack, the trial court reasonably could have concluded that these theories have been tested, have been subjected to peer review and/or publication, have been generally accepted as valid by the relevant scientific community, and there are non-judicial uses which have been made of the theories. *See Robinson*, 923 S.W.2d at 557. Accordingly, the general theory of Bill's cause of death, agreed to by both experts, satisfied the *Robinson* requirements. *See id.*

For the dispute between the experts over the window of time after the increased physical stress that a heart attack could occur in order to be correlated, New Hampshire Insurance argues that, because the risk for a heart attack returns to the baseline level of risk 45 minutes after strenuous activity, Dr. Sander's theory that Bill's heart attack was a result of his training must be unreliable. The testimony that the risk for a heart attack returns to the baseline level of risk 45 minutes after strenuous activity came from New Hampshire Insurance's expert, Dr. White. Dr. White testified that medical literature supported this theory.

19

Dr. Sander testified that it was Bill's activity during fire training school that caused the rupture. He testified that, from a cardiac perspective, Bill had been stable up until the training. He had even had "major abdominal surgery" for colon cancer less than a year before his heart attack and had been "asymptomatic" up until the day after his training. Dr. Sander viewed Bill's physical activity during fire training as significantly higher than his usual physical activity during work. He testified there was a continuity of symptoms from the time that Bill left the fire training school until he had his heart attack and that he did not see any significance in the period of time from when he left the training to when he had his heart attack.

Essentially, New Hampshire Insurance is asking us to presume that its expert's theory is reliable in order to determine that Peggy Allison's expert's theory is unreliable. Conflicting theories between experts, however, do not automatically render one unreliable. *See Thota v. Young*, 366 S.W.3d 678, 695 (Tex. 2012) (holding conflict between experts' theories is matter to be resolved by jury). The trial court could rely on Dr. Sander's expertise and experience as a cardiologist with an active practice that also continues to teach medical students and fellows on cardiological matters as support for the theory that it was possible for a person to experience increased physical stress, have a continuity of symptoms following that increased physical stress, and have a heart attack over 30 hours later. *See Crump*, 330 S.W.3d at 215–16 (citing *Gammill*, 972 S.W.2d at 726–27)

20

(holding expert's experience, knowledge, and training is considered in determining reliability).

When an expert's experience and training is a basis for a reliability determination, the opinion becomes unreliable if there is too great of an analytical gap between the evidence considered by the expert and the opinion offered. *Gammill*, 972 S.W.2d at 726–27; *Tamez*, 206 S.W.3d at 579. New Hampshire Insurance argues that there is too great of an analytical gap because "the evidence established that [Bill] only minimally participated in the . . . training." While there was evidence to support its claim that Bill only minimally participated in the training, New Hampshire Insurance overlooks the fact that there was also evidence that Dr. Sander reviewed to support the argument that Bill's physical exertion during the training was far greater than Bill's physical exertion in his regular work duties. Bellard testified that Bill wore heavier clothing, was exposed to greater heat, and engaged in greater physical activity during the training than what Bill normally experienced at work.

New Hampshire Insurance complains that Dr. Sander "could not test, prove, or demonstrate any evidence of a plaque rupture beyond the six hours preceding the heart attack." Both experts agreed that, absent active testing with use of a catheter on a patient at the specific time, there was no way to test when a plaque rupture specifically occurs. It could only be inferred by the circumstances

surrounding the heart attack.[2] The undisputed testimony, however, was that Bill did have a plaque rupture and died from a later-resulting heart attack.

We hold the trial court was within its discretion to admit Dr. Sander's opinion. Accordingly, we overrule New Hampshire Insurance's first issue.

## Legal and Factual Sufficiency

In its second and third issues, New Hampshire Insurance argues that the evidence was legally and factually insufficient to support the jury's determination that Bill suffered a compensable heart attack.

### A.     Standard of Review

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In performing a legal-sufficiency review, we must credit favorable evidence if reasonable fact finders could credit it and disregard contrary evidence unless reasonable fact finders could not disregard it. *Id.* "If the evidence . . . would enable reasonable and fair-minded people to differ in their conclusions, then [fact

---

[2] Related to this complaint that Dr. Sander could not prove that the plaque rupture occurred more than six hours preceding the heart attack, New Hampshire Insurance complains about Dr. Sander's dispute during his testimony about whether Bill's troponin levels were abnormal during the time of his admission to the hospital. As New Hampshire Insurance's expert explained, when troponin is found in the bloodstream, that is considered proof that a heart attack has occurred within the preceding four to six hours. The timing of Bill's heart attack is well documented in the record. Accordingly, reviewing Dr. Sander's opinion on the level of troponin in Bill's bloodstream would have no effect upon our analysis.

finders] must be allowed to do so." *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* Although the reviewing court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither fact finder nor the reviewing court may disregard the inference. *Id.*

To determine whether the evidence is factually sufficient to support a finding, an appellate court considers and weighs all evidence that was before the trial court. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When an appellant attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See id.* As the reviewing court, we may not act as fact finder and may not pass judgment on the credibility of witnesses or substitute our judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The party appealing the final administrative decision on the compensability of an injury bears the burden of proof by a preponderance of the evidence. TEX. LAB. CODE ANN. § 410.303 (Vernon 2006); *Morales v. Liberty Mut. Ins. Co.*, 241

S.W.3d 514, 516 (Tex. 2007). Because Peggy was the party appealing the final determination of compensability of the heart attack, she bore the burden of proof at trial. *See* LAB. § 410.303.

**B.     Analysis**

In its legal-sufficiency issue, New Hampshire again argues that there was no evidence to establish the heart attack occurred at a definite time and place and was caused by a specific event occurring in the course and scope of Bill's employment. *See* LAB. § 408.008(1). It argues, "There was no evidence that William Allison had an onset of symptoms while participating in fire training." There is nothing in the statute, however, that requires an employee to display an onset of symptoms of a heart attack at the time of work. Instead, the heart attack must "be identified as (A) occurring at a definite time and place; and (B) caused by a specific event occurring in the course and scope of the employee's employment." *Id.*

Both sides' experts agreed that Bill's heart attack began in the late afternoon or early evening on October 25, 2008. This satisfies subsection (1)(A) of the statute. *See id.* § 408.008(1)(A). Dr. Sander testified that it was his opinion that the heart attack was caused by a plaque rupture, which occurred during the course and scope of Bill's employment while he was at the training. This satisfies subsection (1)(B) of the statute. *See id.* § 408.008(1)(B) (requiring heart attack be

identified as "caused by a specific event occurring in the course and scope of the employee's employment").

Even if continuity of symptoms from the time of work to the time of the heart attack were required under the statute, such proof is present here. Specfically, Dr. Sander testified,

> [T]here is nothing in his history from November of 2007 through the beginning of fire training school that suggest[s] any destabilization of his condition. He then undergoes a very stressful situation. . . . And in the context of that, begins having fatigue, nausea, malaise, diaphoresis, indigestion, and then progresses to acute myocardial infarction with rhythm disturbance and is unresuscitatable when he gets to the emergency room because of myocardial infarction. He dies because he develops basically ventricular fibrillation because of myocardial injury due to a buildup of plaque precipitated by his fire training school.

He later testified, "There is a continuity of symptomatology not existing before fire training; beginning within; and after that, culminates in his" heart attack.

New Hampshire Insurance argues that the evidence disproves that Bill was displaying any symptoms even when he was home. It argues, instead, that Bill was behaving normally and engaging in activity such as mowing the yard and having his hair cut. In making this argument, New Hampshire Insurance overlooks the evidence to the contrary. Peggy, her daughter, and her son each testified that Bill was not behaving normally after returning from the training to the time of his heart attack. Their description of Bill's behavior is in line with Dr. Sander's description of the continuity of symptoms.

25

New Hampshire Insurance similarly overlooks other evidence in arguing that there was no evidence that Bill exerted himself any more during his training than he did during work. There was ample evidence in the record, however, to support the contention that, during the training, Bill wore heavier clothing, was exposed to greater heat, underwent greater exertion, and was presented with more stressful than usual circumstances than he experienced during his regular work.

In presenting its factual-sufficiency evidence, New Hampshire Insurance relies on the same evidence to argue that Bill did not exhibit a continuity of symptoms from the time of work to the time of heart attack and that Bill's exertion during training was not any greater than his regular exertion at work. While there was conflicting evidence on these matters at trial, these conflicts are factual disputes to be resolved by the jury. *See Golden Eagle Archery*, 116 S.W.3d at 761 (holding appellate court should not impinge on fact finders' role of judging credibility of witnesses and resolving factual disputes). Nothing in the record suggests that the evidence upon which the jury relied is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

We overrule New Hampshire Insurance's second and third issues.

26

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Bland.