**AFFIRMED AS MODIFIED; and Opinion Filed August 14, 2023**



**In the**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00455-CV**

**DANAE RUTH MCGANN, Appellant**
**V.**
**HANNAH J. LILLY, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-04515-2017**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Molberg, and Justice Carlyle
Opinion by Justice Carlyle

Danae McGann appeals from the trial court's judgment after a jury trial. We affirm as modified in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

Ms. McGann sued Hannah Lilly for negligence based on a car wreck, claiming it caused a debilitating post-concussion syndrome. At trial, Ms. McGann introduced expert testimony from several medical providers. Emergency medicine physician Dr. Martha Grimm testified that she has expertise in concussions, treated Ms. McGann after the accident, diagnosed her with concussion and post-concussion syndrome, and referred her to a neurologist for further treatment.

Neurologist Dr. Pedro Nosnik also treated Ms. McGann after the accident. Based on his examination and a review of her post-accident records and imaging, Dr. Nosnik opined that Ms. McGann suffers from post-concussion syndrome attributed to the accident. He further testified that although most patients fully recover from post-concussion syndrome, there is a small percentage of patients who have lingering symptoms. And he explained that certain pre-existing conditions, including depression and migraines, can make recovery from a brain injury more difficult.

Optometrist Paul Kersjes testified that Ms. McGann sought treatment for visual issues after the accident and reported suffering symptoms consistent with a traumatic brain injury, including nausea, dizziness, and headaches. One of the doctors at his practice diagnosed her with visual discomfort, spatial disorientation, occulo motor dysfunction, and visual spatial deficiency, all of which are consistent with brain injury.

Diagnostic radiologist Dr. Louis Schruff testified that he reviewed a SPECT scan of Ms. McGann's brain following the accident. He explained that a SPECT scan is different from an MRI or CAT scan in that it measures blood flow to assess brain function, whereas the other scans look at structural damage. Dr. Schruff opined that Ms. McGann suffers from decreased brain function in her frontal, temporal, and occipital lobes, which could affect her mood, memory, concentration, vision, and ability to perform complicated tasks. He further opined that a traumatic brain injury

was the most likely cause for Ms. McGann's abnormal brain function, although he could not say whether the accident caused her injury because he did not have a pre-accident SPECT scan for comparison.

Neuropsychologist Dr. Richard Fulbright opined that Ms. McGann demonstrated cognitive and emotional impairment, particularly in the area of coping skills. Dr. Fulbright testified that Ms. McGann appeared to give her best efforts during his examination, and he had no indication she was faking or exaggerating her impairment. Dr. Fulbright attributed Ms. McGann's impairment to the accident, testifying that it affected multiple body systems and aggravated Ms. McGann's preexisting headaches. According to Dr. Fulbright, Ms. McGann can no longer work and, although her biological recovery has plateaued, she will continue to need medication and neuropsychotherapy in the future.

Both Ms. McGann and her daughter testified about how the accident has affected Ms. McGann's life. They testified that the accident was extremely debilitating, that Ms. McGann is not the same person she was before the accident, and that she can no longer participate in many of her pre-accident activities.

During her presentation of the case, Ms. Lilly elicited testimony establishing that Ms. McGann had previously testified at least inconsistently. For example, in her deposition, Ms. McGann testified that before the accident she had never received treatment for depression, taken Prozac, or visited a psychiatrist, psychologist, or neuropsychologist. Yet her medical records showed that she consistently received

psychiatric treatment for depression in the years before the accident, which included prescriptions for Prozac and Wellbutrin. In addition, her medical records showed that she had previously received treatment from a neuropsychologist for memory loss following an accident in 2011. Moreover, Ms. Lilly elicited testimony showing that, despite denying as much during her deposition, Ms. McGann also sought treatment before the accident for chronic headaches, dizziness, visual loss, visual changes, vomiting, sensitivity to light, sensitivity to sound, fatigue, and concentration difficulties—symptoms she claimed resulted from Ms. Lilly's negligence.

Beyond that inconsistent testimony, evidence at trial established that Ms. McGann withheld her relevant medical history from many of the providers from whom she sought treatment after the accident, including her testifying expert Dr. Nosnik. One such provider, neurologist Dr. Sunil Thummala, testified that, after reviewing multiple MRIs and EEGs, he could find no objective evidence to support Ms. Lilly's claims that her symptoms resulted from a post-accident traumatic brain injury. He noted both that the symptoms Ms. McGann reported did not match the injury she claimed to suffer and that her symptoms likely would have resolved in the months following the accident, if she had in fact suffered such an injury. Dr. Thummala wrote after his exam:

> Overwhelming majority of patients recover within a few months after accident. Certainly litigation is a major reason for symptom prolongation, and it is well-documented in literature. I believe her previous doctors perpetuated idea that her headaches are due to her brain damage, which at least I can't see on exam today. Certainly, a

secondary gain as potential cause for her symptoms cannot be definitively ruled out.

Dr. Thummala elaborated that it is well-documented in the medical literature that "patients who have litigation pending and tend to file lawsuits, they tend to have prolonged symptoms [compared to] an average patient who doesn't go that route." He further explained that the term "secondary gain" refers to the patient "looking for something else besides treatment," which could include financial gain. He added that, "[o]verall, looking at the records from past that we received and looking at the exam and what she told us, the story was not making any -- much sense to me." And because there was "a disconnect, certainly we have to entertain the possibility that it could be some secondary gain because I don't want to treat somebody with [a] lot of medications when the intent is not the medication but something else."

Dr. Thummala recalled that Ms. McGann's husband became angry when he explained he found no evidence of a brain injury. Dr. Thummala responded: "You are free to seek opinion from other doctors. You came to me for an opinion, I'm giving you an honest opinion that I'm not seeing any brain damage. If you're fixated on that, basically I can't do much there."

Neuropsychologist Dr. Corwin Boake testified that his examination of Ms. McGann revealed "invalid performance," meaning that she did not give her best efforts to reveal her true capabilities. He also found that she reported having many more symptoms than concussion patients would normally report. And he found it

noteworthy that, despite her long history of chronic mental health problems for which she received medication and psychotherapy, Ms. McGann denied having ever been treated by a psychiatrist. He explained that, based on the symptoms she reported throughout her medical records, she would have been diagnosed with post-concussion syndrome at least as far back as 2011. And based on his examination, the evidence of invalid performance, Ms. McGann's medical history, and her history of mental-health issues, Dr. Boake opined that Ms. McGann did not need treatment for "a traumatic brain injury or a neurocognitive impairment"; rather, she needed a continuation of her "mental health treatment that has been going on for many years."

Ms. Lilly also introduced expert testimony from Dr. Rawson Wood, a licensed physician, accredited accident reconstructionist, and biomechanical consultant. As discussed in more detail below, Dr. Wood opined that, based on his reconstruction of the accident, the resulting forces at play, the relevant medical literature, and his review of Ms. McGann's medical records, the accident did not cause her alleged lingering symptoms, and a "substantial amount of secondary gain" was involved in the case.

The jury largely agreed with Ms. Lilly and awarded Ms. McGann damages for only certain past medical expenses related to the accident. The trial court entered judgment consistent with the verdict, and Ms. McGann appeals.[1]

---

[1] We reject Ms. Lilly's contention that Ms. McGann waived her right to appeal by filing a motion for judgment on the verdict. Ms. McGann's motion specifically noted that "she did not waive her pre-trial and

*Ms. McGann did not preserve her time limits complaint*

Ms. McGann first contends the trial court abused its discretion by limiting her case presentation to between four and five hours, which she contends prevented her from presenting "crucial testimony." Ms. McGann failed to preserve this issue by making an offer of proof or bill of exceptions providing the substance of the evidence purportedly excluded as a result of the time limitations. *See Jones v. Carson*, No. 03-22-00086-CV, 2023 WL 3873509, at *5 (Tex. App.—Austin June 8, 2023, no pet. h.) (mem. op.); *Goss v. Goss*, No. 04-16-00809-CV, 2018 WL 340139, at *2 (Tex. App.—San Antonio Jan. 10, 2018, pet. denied) (mem. op.).

*No abuse of discretion regarding evidence related to Ms. McGann's husband*

Ms. McGann next contends the trial court abused its discretion by failing to exclude certain evidence and argument concerning similar symptoms and injuries Ms. McGann's husband reported suffering in a previous traffic accident. The evidence to which Ms. Lilly referred in argument came directly from Ms. McGann's Exhibit Number 35, records from Dr. Fulbright.

Regarding Ms. Lilly's closing argument highlighting that evidence, Ms. McGann objected without stating a basis, asked to approach, and the bench conference was not recorded. Thus, she failed to preserve the issue by making a

---

trial objections." And she filed a motion for new trial raising many of the complaints she now raises on appeal. *See Edes v. Arriaga*, No. 05-17-01278-CV, 2019 WL 2266391, at *3 (Tex. App.—Dallas May 24, 2019, no pet.) (mem. op.) (no waiver where, among other things, party who moved for judgment also filed motion for new trial).

sufficiently specific objection on the record. *See Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 676 (Tex. App.—Dallas 2018, pet. granted); *Warrantech Corp. v. Comput. Adapters Servs., Inc.*, 134 S.W.3d 516, 529 (Tex. App.—Fort Worth 2004, no pet.) ("[T]his complaint is waived because the . . . general statement of 'objection' when the testimony was offered, followed by an off-the-record bench conference, did not create a record sufficient to preserve the complaint for our review."). Although a general objection may suffice if its grounds are apparent from context, *see* TEX. R. APP. P. 33.1(a)(1)(A), that is not the case here. Even with the benefit of Ms. McGann's appellate arguments, we cannot determine with any precision the basis of her trial objection.

*No abuse of discretion to exclude untimely disclosed evidence*

Ms. McGann next complains that the trial court abused its discretion by excluding certain witnesses and documentary evidence that she failed to timely disclose under the operative scheduling order. *See* TEX. R. CIV. P. 193.6. She contends the trial court should have allowed the evidence because she showed either good cause for the untimely disclosure or a lack of unfair surprise or prejudice to Ms. Lilly. *See id.* Assuming preservation and an abuse of discretion, Ms. McGann has not demonstrated that the exclusion "probably caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1.

With respect to the excluded lay witnesses, Ms. McGann offers only general assertions that the testimony from these "disinterested third parties would have been

offered to bolster observations of [her] doctors and family" and "provide the jury with independent accounts of [her] affected behavior and suffering because of the accident." She does not identify the relevant testimony each witness would have provided, except to say that each would "relat[e] evidence of behavior consistent with [a closed-head] injury." Moreover, she fails to explain why having these additional witnesses "bolster" the testimony Ms. McGann, her doctors, and her family provided would not have been cumulative. *See Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018) (noting that "[e]xclusion is likely harmless if the evidence was cumulative"). We can discern no harm.

With respect to the excluded medical testimony and records, Ms. McGann offers only a conclusory assertion that, "[h]ad the jury had a chance to listen" to her "qualified expert doctors, there is a substantial chance this case could have come out differently." She neither identifies the specific subject matter of the excluded medical testimony nor explains how that testimony would have been both noncumulative and "crucial to a key issue." *See id.* On this record, based on Ms. McGann's appellate arguments, we cannot conclude the trial court reversibly erred by excluding her untimely disclosed evidence.

*No abuse of discretion to allow Dr. Wood's expert testimony*

Ms. McGann next contends the trial court abused its discretion by allowing Dr. Rawson Wood to testify as an expert for the defense. Ms. Lilly contends Ms. McGann failed to preserve this issue as well, because her trial objection lacked

sufficient specificity.[2] We disagree. To preserve a complaint that expert evidence is unreliable, a party must object to that evidence either before trial or when the evidence is offered. *Baker v. Habeeb*, No. 05-16-01209-CV, 2018 WL 1835566, at *4 (Tex. App.—Dallas Apr. 18, 2018, pet. denied) (mem. op.). Here, Ms. McGann moved to exclude Dr. Wood's testimony as unreliable before trial, and has sufficiently preserved her objections to Dr. Wood's expert testimony at least to the extent of the motion. *See id.*; *Austin v. Weems*, 337 S.W.3d 415, 421 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (where reliability is challenged by pre-trial motion to exclude, there is no need to object again in front of the jury).

The trial court has broad discretion in determining the admissibility of an expert's opinion, and we will reverse only if the trial court abuses that discretion by acting without reference to any guiding rules or principles. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex. 1995). Expert testimony is admissible if: (1) the witness is qualified to testify as an expert based on his "knowledge, skill, experience, training, or education," TEX. R. EVID. 702; and (2) the testimony is both relevant and based on a reliable foundation. *TXI Transp. Co. v.*

---

[2] Ms. McGann filed a motion to abate the appeal so the trial court could correct the reporter's record, which describes her trial objection as follows: "I would just like to renew for the record our objection to the opinion testimony related to this based upon our---the information in our (unintelligible) motion." Ms. McGann urges that the portion of the record saying "(unintelligible) motion" should instead say "pre-trial Daubert motion." We denied Ms. McGann's motion to abate the appeal, and she has filed a motion for reconsideration. Because we conclude her objections to Dr. Wood's testimony are preserved to the extent asserted in her pre-trial motion to exclude, we deny her motion for reconsideration as moot.

*Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). "An expert's testimony is relevant when it assists the jury in determining an issue or in understanding other evidence." *Id.*

If an expert testifies on scientific matters, the testimony must be both "grounded in the methods and procedures of science" and based on reliable foundational data. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 73–74 (Tex. 2023) (quotation omitted). A court cannot ignore "fatal gaps in an expert's analysis or assertions that are simply incorrect," which "may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached." *Id.* (quoting *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015)).

The supreme court has identified six non-exclusive factors courts may consider in determining whether expert testimony is sufficiently reliable: (1) "the extent to which the theory has been or can be tested"; (2) "the extent to which the technique relies upon the subjective interpretation of the expert"; (3) "whether the theory has been subjected to peer review and/or publication"; (4) "the technique's potential rate of error"; (5) "whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community"; and (6) "the non-judicial uses which have been made of the theory or technique." *Id.*

The record shows Dr. Wood is a licensed physician who has treated patients with concussions and traumatic head injuries. He is board certified in aerospace and occupational medicine, both of which he testified have crash investigation and resultant injury causation as part of their formal curricula. He also has a degree in aeronautical engineering and teaches as an adjunct professor at the United States Air Force School of Aerospace Medicine, where he helps residents learn about impact by biomechanics. Since 2016, Dr. Wood has worked as a consultant in the field of "injury causation analysis (ICA)."

In addition to his education, training, and experience in the areas of engineering and medicine, Dr. Wood studied accident reconstruction at Northwestern University and received full accreditation from the Accreditation Commission for Traffic Accident Reconstruction in 2017. Dr. Wood co-authored two published, peer-reviewed research papers "studying kinematics and injury potential in low speed rear automotive impacts." And he has performed biomechanical analyses using the ICA methodology in more than 230 cases.

According to Dr. Wood, ICA is adapted from the scientific method for the primary purpose of developing safety and injury prevention technologies, and it is used extensively by industry and government to develop enhanced safety measures. It can be used "forensically to find the basis for a causal relationship between an incident and an injury."

Dr. Wood explained that ICA involves using physics and commonly accepted accident reconstruction techniques to "reconstruct the subject event." From there, the process involves determining the event's injury potential and comparing expected injuries during the event with injuries documented in the medical records. This allows conclusions to be drawn about the likelihood that the documented injuries resulted from the subject event.

With respect to accident reconstruction, Dr. Wood testified that "automotive investigations typically include[] a determination of the Principal Direction of Force (PDOF) and the impact-related change of velocity (delta-V)," which are often "determined based on examination of the vehicle, including photographs and/or repair estimates of the vehicle." He explained that, "[a]s speeds increase, the potential for damage and injury typically increases." And "[a]s most events follow commonly described patterns," published scientific literature can support the investigation process both with respect to the subject event and the pattern of injuries.

Dr. Wood testified about ICA's potential error rates, noting that the primary area of concern is measurement error. But "by conservatively over-valuing forces in favor of a more significant interaction and providing those values in terms of ranges, any error is accurately accounted-for."

Dr. Wood also testified that ICA theory and techniques are longstanding, generally accepted in the scientific community, "and have been and are subject to

extensive peer review and publication in numerous textbooks, journals and scientific and professional conference proceedings." He notes that "the application of the ICA to incidents such as [Ms. McGann's] accident are expressly set forth by publication in the *AMA Guides Newsletter*, a peer-reviewed publication of the American Medical Association." And he adds that ICA theory and techniques have been used by numerous governmental agencies, including the Department of Defense, the Department of Transportation, the FAA, the NTSB, and OSHA.

Dr. Wood further testified that the use of computer programs applying ICA techniques to accident reconstruction is widespread. He explained that one such program, EDSMAC, was developed at the request of the National Highway Transportation Safety Agency (NHTSA), using elements of ICA "to determine the conditions of impact, including vehicle dynamics and occupant kinematics." According to Dr. Wood, "EDSMAC is a validated and published physics-based commercial software" program that "uses algorithms to extrapolate unknown data from known values." It does this by running simulations "in an iterative manner, each time adjusting the unknown values in the interactions to solve the equations until they correspond to the real world data points such as final points of rest."

With respect to the accident in this case, Dr. Wood said he relied upon, among other things, the police crash report, the insurance loss report, a repair estimate for Ms. McGann's Dodge Durango, a recorded statement from Ms. Lilly, Ms. McGann's deposition, color photographs from the scene of the accident, color photographs of

the cars involved, and Ms. McGann's medical records. Dr. Wood testified that the photographs helped him determine the direction of the force, magnitude of the force, and the protective equipment inside the cars. He also obtained an exemplar Dodge Durango from which to obtain relevant measurements.

Dr. Wood testified he performed an accident reconstruction using two independent methods. First, he performed a damage-based "crush" analysis using equations taken from the relevant literature to determine that the barrier equivalent velocity of the crash was 19.3 miles per hour. He explained that this meant the "crush energy" and "crush characteristics" of the crash were equivalent to Ms. McGann driving her Dodge Durango "into a rigid brick wall barrier at 19.3 miles per hour." Second, he used the EDSMAC program to recreate the accident using simulations, ultimately determining that the delta-V, the impact-related change of velocity, was 18.9. His report noted that the EDSMAC results were "consistent with the damage-based analysis and the vehicle rest positions are consistent with those in the police diagram."

Dr. Wood testified based on NHTSA crash test data that Ms. McGann's Dodge Durango was designed to be safe at speeds up to 35 miles per hour. And in rigid-barrier crash testing performed on the car by the NHTSA at that speed, the peak head acceleration was measured at approximately 50 g. According to Dr. Wood's report, Ms. McGann's peak head acceleration in the subject accident, which involved a

barrier equivalent velocity of 19.3, would have been significantly less than 50 g— approximately 30 g.

According to Dr. Wood, published data from the NHTSA's database, which catalogs hospital records from people involved in tow-away crashes, shows that the risk of suffering a concussion at a delta-V of 19 is almost zero. Dr. Wood likewise added that published biomechanical literature showed the concussion risk at the peak head acceleration Ms. McGann experienced would be "essentially zero."

In his report, Dr. Wood cited literature suggesting there was little evidence to support a relationship between mild traumatic brain injuries and permanent impairment. And he cited medical literature suggesting that claims of lingering post-concussion symptoms are strongly associated with unresolved litigation and compensation. Based on his review of Ms. McGann's deposition and medical records, Dr. Wood opined that Ms. McGann did not suffer a concussion or traumatic brain injury as a result of the accident, and "[a]ny diagnosis, subsequent investigations and treatment relate[d] to brain damage, visual or vestibular dysfunction, depression, anxiety and other psychiatric disorders are not causally related to the" accident. He did not dispute that Ms. McGann suffered from psychiatric illness or other neurologic conditions, but those conditions "started before, continued after and were unchanged from the subject event." He also opined that a "substantial amount of secondary gain" was involved in the case.

Though she did not attempt to present an expert to combat Dr. Wood's testimony, Ms. McGann makes a host of arguments under the aegis of a 702 challenge, purportedly in search of the fatal "analytical gaps," but which in reality are attempts to create an expert battle on appeal. We are not the fact-finder in this case, and for this underlying reason, we reject most of Ms. McGann's appellate complaints. *See Thota v. Young*, 366 S.W.3d 678, 695–96 (Tex. 2012). In any event, the trial on the merits, including cross-examination and her opportunity to present an expert of her own, are the real-world remedies for Ms. McGann's complaints. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998) ("The trial court's gatekeeping function under Rule 702 does not supplant cross-examination as the traditional and appropriate means of attacking shaky but admissible evidence.") (cleaned up); *New Hampshire Ins. Co. v. Allison*, 414 S.W.3d 266, 276 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Conflicting theories between experts . . . do not automatically render one unreliable.").

Atypically, Ms. McGann begins her argument on this issue by discussing the harm she suffered due to Dr. Wood's testimony. She next argues that, because other courts have excluded other expert witness testimony from others associated with the company he works for, Biodynamics Research Company, the trial court should have excluded Dr. Wood's testimony. "Whether another expert affiliated with [this expert] was successfully or unsuccessfully challenged does not address [this expert's] qualifications or methodology." *Nabors Well Servs., LTD v. Romero*, 508 S.W.3d

512, 534–35 (Tex. App.—El Paso 2016, pet. denied). "Other than the relatively rare instance when our supreme court, or one of our sister courts of appeals have specifically addressed the expert before us on similar facts, with similar methodological challenges, merely reciting that another court has struck or allowed an expert is little more than a make-weight argument." *Id.* We find insufficient similarities in any of Ms. McGann's cases to use these other court's conclusions—from other cases with other experts and other facts—to conclusively govern our analysis here.

Ms. McGann also argues—citing no authority—that Dr. Wood is not qualified to provide accident reconstruction testimony because he does not have a degree in biomechanical engineering, has not worked as an engineer, is not licensed as an engineer, and has not published papers regarding biomechanics. Dr. Wood testified that he worked as a "human factors engineer" in the U.S. Air Force; has a degree in aeronautical engineering; studied accident reconstruction at Northwestern University; is fully accredited by the Accreditation Commission for Traffic Accident Reconstruction; co-authored two published, peer-reviewed research papers involving the injury potential of certain low-speed traffic accidents; and has conducted ICA analyses in more than 230 cases. The trial court did not abuse its discretion by determining that Dr. Wood is qualified to provide his accident-reconstruction opinions. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996).

Ms. McGann contends that Dr. Wood did not properly use accident reconstruction tools, though she acknowledges that "if the rigors of scientific method are used," those tools "can be useful." She argues that Dr. Wood's testimony is unreliable because he based it "entirely on his eyeball estimate" of the damage to Ms. McGann's car, using "blurry photographs" instead of a physical examination. This mischaracterizes Dr. Wood's analysis, which both his testimony and report reveal was based on, among other things, the police report, insurance report, photographs, third-party repair estimates, NHTSA crash-test data, witness statements, and measurements taken from an exemplar vehicle. Dr. Wood also testified that the sources he used to perform his analyses were sufficient under peer-reviewed, industry-accepted accident reconstruction methodology.

Ms. McGann points to no record evidence contradicting Dr. Wood's testimony that the sources and methodology he used are accepted within the field of accident reconstruction. Instead, she quotes conclusory data from a single article she asserts "specifically invalidates" Dr. Wood's damage-based methodology, but makes no attempt to explain how the data support her conclusory argument. *See* Bartlett, W. et al., *Evaluating the Uncertainty in Various Measurement Tasks Common to Accident Reconstruction*, JOURNAL OF PASSENGER CAR: MECHANICAL SYSTEMS JOURNAL, Vol 111 § 6, 657 (2002). The article describes a limited experiment and specifically states that proper accident reconstruction would need more "details and analysis" than

those used in the experiment. Dr. Wood's crush analysis was not limited in the ways the experiment was and we reject this argument.

Ms. McGann also complains that Dr. Wood's use of the EDSMAC software was unreliable because he arbitrarily "guessed at" certain input values and ran the program until he got the results he wanted. This mischaracterizes Dr. Wood's testimony and analysis: he explained that the EDSMAC software works by running simulations "in an iterative manner, each time adjusting the unknown values in the interactions to solve the equations until they correspond to the real world data points such as final points of rest." Thus, in order to get the simulation to match known facts about the collision, he had to adjust certain input variables, such as starting positions and steering angles, until the simulation matched the known data.

Ms. McGann also challenges certain values Dr. Wood used in his ESMAC analysis, including vehicle weight, speed, and the stiffness of Ms. Lilly's vehicle. The trial court was free to credit Dr. Wood's explanation as to why his values were appropriate under the circumstances. On this record, the trial court did not abuse its discretion by allowing Dr. Wood's accident reconstruction testimony.

Ms. McGann next attacks the validity of Dr. Wood's causation opinions based on his accident reconstruction analysis. She argues that Dr. Wood's opinions about vehicle impact are irrelevant because he did not use a "crash pulse" analysis to calculate Ms. McGann's "occupant impact velocity," which she contends would have provided a more accurate predictor of injuries than delta-V. She cites one article

outlining certain limitations of delta-V as an injury predictor. *See* Tsoi, A. et al., *Evaluation of Vehicle-Based Crash Severity Metrics*, TRAFFIC INJURY PREVENTION (2015). But that article's authors acknowledge delta-V "is a widely used crash severity metric used to estimate occupant injury risk," thus undercutting Ms. McGann's assertions that Dr. Wood's methodology is not widely accepted within the field. As we suggested, any scientific disagreement about the relative predictive value of delta-V in assessing injuries provides fertile ground for cross-examination, but does not render it irrelevant. *See Gammill*, 972 S.W.2d at 728; *New Hampshire Ins. Co.*, 414 S.W.3d at 276.

Similarly, Ms. McGann's assertion that Dr. Wood's analysis did not adequately account for rotational forces and vehicle safety features does not render his opinions irrelevant. Ms. McGann again cites a single article suggesting that oblique impacts have a greater potential for brain injury than perpendicular impacts. *See* Kleivan, S., *Why Most Traumatic Brain Injuries are Not Caused by Linear Acceleration but Skull Fractures Are*, FRONTIERS OF BIOENGINEERING AND BIOTECHNOLOGY (2013). But Ms. McGann cites no record evidence, much less expert testimony, establishing either the significance of any rotational forces in this accident or that Dr. Wood's analysis fails to account for those forces such that his conclusions are unreliable.

Likewise, Ms. McGann argues that crush measurements taken from vehicles with foam bumpers can be misleading because they do not account for the amount

of force absorbed by the bumpers. But the article she cites for support addresses low-speed collisions where the forces at issue are insufficient to cause visible vehicle deformation, noting that in such cases, it can be difficult to visually assess crash severity. *See* Happer, A.J. et al., *Practical Analysis Methodology for Low-Speed Vehicle Collisions Involving Vehicles with Modern Bumper Systems*, JOURNAL OF PASSENGER CAR: MECHANICAL SYSTEMS JOURNAL, Vol. 112, § 6, 414 (2003). The collision in this case involved speeds sufficient to cause significant vehicle deformation. Thus, it is unclear whether and to what extent the article's observations about bumper absorption in low-speed collisions apply. Regardless, Ms. McGann fails to cite any record evidence establishing the types of bumpers at issue in this case or that Dr. Wood's analysis failed to sufficiently account for any forces absorbed by them.

Ms. McGann also contends that Dr. Wood "is wholly unqualified" to offer medical or psychiatric conclusions about the cause of her symptoms. She argues without citing any authority that "[o]pinions relating to secondary gain are the province of mental health professionals." Dr. Wood testified that he is a licensed physician who has treated patients with concussions and other head injuries. Although he is not a board-certified neuropsychiatrist, he testified that he has been credentialed to perform neuropsychological exams, and he has made many psychiatric diagnoses for which he has provided treatment. In addition, Dr. Wood testified he is board certified in occupational and aerospace medicine, which

includes formal curricula in investigating accident-related injury causation. And his report demonstrates familiarity with reputable medical literature suggesting a strong association between patients reporting persistent concussion symptoms and unresolved issues of compensation and litigation. *See, e.g.*, Ropper, A., et al., *Concussion*, NEW ENGLAND JOURNAL OF MEDICINE (2007). On this record, the trial court did not abuse its discretion by determining that Dr. Wood is qualified to offer his medical causation opinions.

Ms. McGann also contends the trial court should have excluded Dr. Wood's medical causation opinions because they are "highly prejudicial" and "inherently speculative," arguing that Dr. Wood testified Ms. McGann's "current complaints all arose from a motive of secondary gain." But Dr. Wood opined that Ms. McGann's symptoms arose from pre-existing conditions that were not medically affected by the accident and also that there was a "substantial amount of secondary gain involved in this case."

Regardless, in addition to the relevant medical literature cited above, the record Dr. Wood considered in formulating his opinions contained substantial evidence from which he could conclude secondary gain was a factor in Ms. McGann's persistent symptom reporting—including Dr. Thummala's and Dr. Boake's observations, as well as evidence largely withheld from the jury concerning similar claims and symptoms alleged by Ms. McGann's husband and daughter. The trial court did not abuse its discretion by allowing Dr. Wood's testimony.

–23–

*The court should have awarded Ms. McGann her taxable costs*

Finally, Ms. McGann complains the trial court abused its discretion by failing to award her taxable court costs. We agree. Under the rules of civil procedure, "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131. A "successful party" is "one who obtains judgment of a competent court vindicating a civil right or claim." *Mag Instrument, Inc. v. G.T. Sales Inc.*, 294 S.W.3d 800, 808 (Tex. App.—Dallas 2009, pet. denied) (quoting *City of Houston v. Woods*, 138 S.W.3d 574, 581 (Tex. App.—Houston [14th Dist.] 2004, no pet.)). "Whether a party is 'successful' is based on success on the merits and not on the award of damages." *Id.*

Here, Ms. McGann sued Ms. Lilly for negligence, and Ms. Lilly disputed liability. The claim went to trial, and the trial court granted Ms. McGann a directed verdict with respect to liability. The jury awarded damages for certain past medical care expenses that Ms. McGann incurred as a result of Ms. Lilly's negligence, and the trial court entered judgment in Ms. McGann's favor. She is thus a "successful party" for purposes of rule 131. And absent a record finding of good cause for allocating costs otherwise, Ms. McGann is entitled to recover her costs. *See* TEX. R. CIV. P. 131, 141.

We reject Ms. Lilly's argument that the trial court was within its discretion to deny Ms. McGann her costs without making a record finding of good cause because Ms. McGann did not prevail on the "main issue" at trial and thus does not qualify as

the "prevailing party" under cases applying section 38.001 of the civil practices and remedies code. *See Mag Instrument, Inc.*, 294 S.W.3d at 808 ("[T]he prevailing party is typically the party who either successfully prosecutes the action or successfully defends against it, prevailing on the main issue."). But the standard for cost awards under rule 131 is distinct from the "prevailing party" standard for attorney-fee-shifting under civil practices and remedies code section 38.001. *See id.* The relevant inquiry under rule 131 is whether Ms. McGann "obtain[ed] judgment of a competent court vindicating a civil right or claim" on the merits, not whether she prevailed on the "main issue" at trial. *See id.*

We modify the trial court's judgment to award Ms. McGann her court costs and affirm the judgment as modified.

220455f.p05

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

–25–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DANAE RUTH MCGANN,
Appellant

No. 05-22-00455-CV     V.

HANNAH J. LILLY, Appellee

On Appeal from the 366th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 366-04515-
2017.
Opinion delivered by Justice Carlyle.
Chief Justice Burns and Justice
Molberg participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

A sentence is added stating: "Danae Ruth McGann shall recover her court costs from Hannah J. Lilly."

It is **ORDERED** that, as modified, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellant Danae Ruth McGann recover her costs of this appeal from appellee Hannah J. Lilly.

Judgment entered this 14th day of August, 2023.